*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 26**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

SALVADOR GALLAGA CASTILLO,
*Appellant.*

No. 20230316
Heard December 8, 2025
Filed July 30, 2026*

On Direct Appeal

Third District Court, West Jordan
The Honorable William K. Kendall
No. 191404038

Attorneys:

Derek E. Brown, Att'y Gen., Michael Palumbo, Asst. Solic. Gen.,
Salt Lake City, for appellee

Andrea J. Garland, Salt Lake City, for appellant

ASSOCIATE CHIEF JUSTICE POHLMAN authored the opinion of the
Court, in which JUSTICE PETERSEN, JUSTICE JORGENSEN,
JUSTICE DENT, and JUDGE NEIDER joined.

Having recused himself, JUSTICE NIELSEN did not participate
herein; DISTRICT COURT JUDGE CAMILLE L. NEIDER sat.

Before this case was decided, CHIEF JUSTICE DURRANT recused
himself from this case and JUSTICE HAGEN stepped down from the

---

* As of January 31, 2026, "The Supreme Court consists of seven
justices." UTAH CODE § 78A-3-101(1). Pursuant to Utah Supreme
Court Standing Order No. 18, this court sat and rendered judgment
in this matter as a division of five justices.

court. JUSTICE JORGENSEN and JUSTICE DENT, having reviewed the briefs and listened to a recording of the oral argument, substituted for CHIEF JUSTICE DURRANT and JUSTICE HAGEN and participated fully in this decision.

---

ASSOCIATE CHIEF JUSTICE POHLMAN, opinion of the Court:

## INTRODUCTION

¶1 Salvador Castillo sexually abused and raped his niece (Niece) when she was a child. When Niece became an adult, she reported Castillo to local authorities, who pursued charges against him. A jury convicted Castillo on four counts of aggravated sexual abuse of a child and one count of rape of a child. Castillo appeals his convictions and asserts multiple claims of error.

¶2 First, Castillo claims errors related to an expert witness, who testified at trial about his experience interviewing children and the reasons they might delay disclosing sexual abuse. Because we determine that Castillo waived much of his challenge under Utah Rule of Evidence 702 and that he has not shown why his trial counsel performed deficiently in doing so, we do not consider these challenges on appeal. Castillo also asserts that his trial counsel was ineffective for failing to object, request a curative instruction, or move for mistrial when the expert testified that it is "rare" for children to make false allegations of sexual abuse. We reject this argument because Castillo has not established that his counsel performed deficiently by addressing the testimony through cross-examination and in closing argument.

¶3 Second, Castillo claims errors related to the use of the word "victim" at trial. Castillo asserts he received constitutionally ineffective assistance when his trial counsel did not at least object to the use of the word and when counsel used it himself. Castillo also asserts that the trial court plainly erred by allowing the statements. We conclude that Castillo's counsel did not provide ineffective assistance by not objecting to the word "victim" or by using it himself. Reasonable trial counsel could have determined the general references to victims did not bolster Niece's credibility or impair Castillo's presumption of innocence. Castillo similarly has not shown that the trial court committed plain error by allowing these uses because he does not sufficiently explain what action the court should have taken or that it was obviously wrong not to intervene.

¶4 Third, Castillo asserts he received ineffective assistance because his trial counsel did not object to Niece's testimony about self-harm. We reject Castillo's challenge because he has not established that his counsel performed deficiently by forgoing an objection and choosing to address the testimony on cross-examination consistent with his primary trial strategy of undermining Niece's credibility.

¶5 Fourth, Castillo contends that under *State v. Robbins*, 2009 UT 23, 210 P.3d 288, the trial court should have disregarded Niece's testimony as inherently improbable and therefore determined that the State's evidence was insufficient to support his convictions. Because we determine that Castillo did not preserve his inherent improbability challenge, we review the issue for ineffective assistance of counsel and conclude that he hasn't shown his trial counsel performed deficiently by not bringing a futile motion.

¶6 Accordingly, we affirm.

## BACKGROUND[1]

### *The Aggravated Sexual Abuse and Rape*

¶7 When Niece was five or six years old, her family immigrated to the United States and moved in with Castillo and his family. Although they later moved out, Niece and her family still visited Castillo's house "pretty often." And when Niece was about nine years old, Castillo started to behave in ways that she "didn't like." For example, he would awkwardly stare at her, and, at the end of her visits, he would kiss her on the mouth instead of on the cheek.

¶8 Then, when Niece was about nine or ten, Castillo sexually abused her "two or three times." On one occasion, he pulled her out of the upstairs bathroom into his adjoining bedroom and touched her breasts and buttocks over her clothing. And on another occasion, Castillo again pulled Niece into his bedroom where he kissed her and told her she was beautiful and that he loved her. Castillo then touched her breasts and her vagina over and under her clothes.

---

[1] "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Hunt*, 2025 UT 54, n.1, 582 P.3d 772 (cleaned up).

¶9 Sometime after the abuse began, Castillo started texting Niece, telling Niece that she was "precious" and that he loved her. He also instructed her to delete the messages and "not to tell [her] parents" about the abuse because he'd get in trouble and leave her cousins without a dad. That affected Niece because she "really care[d] about [her] cousins."

¶10 Niece moved with her family to an apartment in West Jordan when she was around eleven or twelve years old. While there, Niece and her younger brother were often home alone on weekdays before school. Niece was responsible for waking up her brother, who would usually sleep until 7:00 a.m.

¶11 One morning, while her brother was asleep, Castillo knocked on the sliding glass door at the back of the apartment and asked if Niece's father was home. When Niece said he wasn't, Castillo came inside. Once in, Castillo started to undress himself and Niece, and he started touching her breasts and buttocks. He then started kissing Niece, grabbed her vagina, and "grab[bed] [her] hand to grab his penis." Castillo then laid Niece on the floor and raped her, telling her that "it's normal and this happens." When Castillo would leave the apartment, Niece "would just cry and clean [her]self up." Her body would shake, and she would be in pain.

¶12 Niece didn't tell her parents about the sexual abuse or rape, but her mother eventually discovered Castillo's text messages to Niece, including a text saying he "wanted to make love to her again." When her mother asked Niece who the texts were from, Niece said that she didn't know. But after her parents looked up the phone number in their own phones, they asked if the messages were from Castillo and Niece nodded yes.

¶13 Upon this discovery, Niece's parents took her to Castillo's home to talk to him. Castillo, Castillo's wife, and Niece's grandparents were at the house, but her grandparents went into the hall. Niece's parents again asked her if anything had happened between her and Castillo, and Niece "would just cry—cry a lot" and shake her head no. She didn't disclose what had happened because she was "embarrassed" and "didn't want to mess up [her] family." Also, Castillo had told her not to tell anyone, and he "was there staring at [her]," which "made [her] more uncomfortable."

¶14 When asked to explain the text messages, Castillo initially denied sending them and suggested his seven-year-old son could have sent them. Castillo then claimed both that it was a mistake—

"he wanted to put something else" in the texts—and that they "were just messages" and not "anything important." Later, Castillo told Niece's parents that "he had actually tried to send those messages to another woman."

¶15 One morning a few weeks after the confrontation, Niece's father came home to take the children to school and found Castillo standing outside the sliding glass door. Niece's father asked Castillo why he was there, and he said he came to talk to Niece's mother. Niece's father expressed some doubt because he believed Castillo knew Niece's mother would be at work, but Castillo said that "he wanted to apologize and stuff." When Niece's mother arrived home, Castillo again said that "he wanted to apologize for everything that had happened." When asked what he was apologizing for, since he had previously denied any wrongdoing, Castillo said that "he felt bad about everything" and "didn't want to be sent to Mexico." Castillo was crying and told Niece's parents "that he didn't want the same thing to happen to his daughter."

¶16 Despite the text messages and the apologies, Niece did not disclose the rape or sexual abuse for many more years. In the meantime, Niece and her family would still visit Castillo's house to see Niece's grandparents and Castillo's wife, but Niece stayed close to her mother, who "never spoke to [Castillo] again." When Niece's mother would occasionally ask Niece whether anything had happened with Castillo, Niece might cry and hug her mother, but she didn't disclose the abuse because she was "scared and confused." When Niece was about thirteen or fourteen years old, she started cutting herself and having suicidal thoughts.

*Niece's Report of the Rape and Sexual Abuse*

¶17 After years of denials, Niece, at twenty years old disclosed that Castillo had raped and sexually abused her as a child. Having become a mom herself, Niece knew how it felt to want to protect her daughter, so she told her mother during a shopping trip at Sam's Club. A few months later, she also told her father and then her boyfriend, whom she later married. Niece then reported Castillo's crimes to the police.

¶18 The State charged Castillo with four counts of aggravated sexual abuse of a child and one count of rape of a child. All five charges are first-degree felonies.

*The State's Blind Expert*

¶19 Before trial, the State provided notice of its intent to call a Children's Justice Center (CJC) forensic interviewer (Expert) to provide expert testimony about CJC interviews and the disclosure of child sexual abuse. The State proposed Expert as a "blind witness," which means that he would not meet the victim or learn the facts of the case, and would "provide the jury with general information, rather than case-specific information." The State explained that Expert would inform the jury about the "proper procedure for questioning children regarding possible child sexual abuse and the reasoning that undergirds those procedures," and would "help the jury understand the dynamics of children confronted with sexual assault and how they may or may not communicate their circumstances."

¶20 Castillo moved to exclude Expert from testifying at trial, contending among other things that the State had not satisfied the admissibility threshold of rule 702 of the Utah Rules of Evidence. Specifically, Castillo argued that the State's notice failed to show that the principles or methods underlying Expert's anticipated testimony "(1) are reliable, (2) are based upon sufficient facts or data, and (3) *have been reliably applied to the facts*." (Quoting UTAH R. EVID. 702(b).)

¶21 After an evidentiary hearing, the parties argued the motion. Castillo's counsel identified two problems: (1) Expert had expertise on CJC interviews, but "there is no CJC interview for him to opine on"; and (2) the State intends to ask questions that Expert is not qualified to testify about.

¶22 Regarding the second point, counsel drew a distinction between permissible and impermissible topics of inquiry. For example, counsel asserted that he thought it "proper and okay for [Expert] to say that we have seen late reportings [of child sexual abuse], and there's lots of reasons why someone may make a late reporting and possibly include all the possibilities." But, counsel continued, "the problem is I don't think he can quantify it. [And] that is my main concern about having him testify." In other words, counsel reiterated his "main concern is not necessarily that [Expert] can say there's lots of reasons for late reporting, such as fear, retaliation, uncertainty." In fact, he was "okay with that kind of stuff." What caused him concern was Expert's attempts to "quantify[] things without studies" and to testify that certain reporting behaviors are "common" or "rare."

¶23 In response, the State explained that Expert's testimony was "key" to the jury understanding the dynamics of intrafamilial abuse and how those dynamics affect a victim's disclosure of sexual abuse. And when pressed by the court about defense counsel's concern over quantifying experiences, the State conceded that "exact numbers and percentages" may be prohibited. However, the State pushed back on defense counsel's view that Expert testifying about certain behaviors being "common" or "rare" is inappropriate.

¶24 In rebuttal, defense counsel began by asserting, "Again, don't have an issue of generalities of possible explanations." Instead, his concern was with Expert testifying that certain reporting behaviors were common or rare when Expert had not "scientifically verified" those quantitative assessments. According to counsel, Expert could not quantify certain reporting behaviors because Expert had not conclusively determined whether the children reporting child abuse to him were telling the truth about the abuse.

¶25 After taking the motion to exclude Expert's testimony under advisement, the trial court granted it in part and denied it in part. The court concluded that while Expert's testimony was admissible under rule 702, its scope was limited to "the behavioral characteristics of child abuse victims and the reasons they might make multiple or differing disclosures about the abuse they suffered." And the court specifically concluded that "it would be improper for [Expert] to express opinion on the frequency of false accusations, either in the form of numerical probability or by using terms like 'common' or 'rare.'"

¶26 At trial, Expert testified that in the six years he had worked as an interviewer at the CJC, he had interviewed almost 900 children. He also testified that as part of his duties, he reviewed literature in the field of child abuse. Expert further explained that he was unfamiliar with the facts of the case and that he was there "to provide general information to the . . . jury about child abuse."

¶27 When asked if, based on his experience, children report sexual abuse "right away," Expert said, "Not always." And when asked why, Expert said that very young children may not understand that abuse has occurred, while other children may fear the consequences of disclosure—for example, children may have been told not to tell or have been threatened, they may fear not being believed, and they may believe that the abuse was their fault.

He also explained that some of the children he interviewed delayed disclosure "for a substantial period of time."

¶28 The State then asked Expert to explain why a child might retract claims of sexual abuse. Expert said it could be that the allegation was false, but he opined that false allegations are "rare" and that "more often times" children retract allegations of abuse because of feelings of guilt or pressure from others. Castillo's counsel asked to approach the bench and then requested a "short break" to "remind [Expert]" to not "make statements like rare." And at the court's invitation, the State took a "sidebar" with Expert after which the examination continued with the State asking Expert if familial relationships affect disclosures. Expert then testified that "a lot of times" if the perpetrator is related to the child, the child may be "more reluctant" to disclose the abuse, resulting in "delayed disclosure." And when asked how abuse comes out, Expert said, "A lot of times the initial disclosure will come out to a trusted parent, but that's not always the case." Expert also testified that "typically, the longer . . . the perpetrator's been in the child's life, the more likely they are to delay disclosure." This testimony came in without objection.

¶29 In cross-examining Expert, Castillo's counsel asked Expert whether it was his job as a CJC interviewer to challenge the child's assertions. Expert said that he might challenge what a child says in seeking clarification, but that he isn't there to test the veracity of the child's statements. Expert also conceded that false allegations are possible and that a child might make a false allegation "for a host of unknown reasons."

*Alleged Inconsistencies*

¶30 In addition to cross-examining Expert, Castillo's counsel cross-examined the State's witnesses and called some of his own to try to establish inconsistencies in the testimony supporting the State's case. These alleged inconsistencies include:[2]

- Niece testified at trial that Castillo's sexual abuse began when she was nine or ten years old, and that he raped her

---

[2] Some of the inconsistencies Castillo's counsel suggested at trial are unsupported by the preliminary hearing transcript. But because neither Niece nor the State challenged counsel's representations, we recite Niece's preliminary hearing testimony consistent with those representations.

when she was eleven or twelve. Niece initially told police that "[w]hen [she] was 11 or 12 years old," Castillo "sexually touched [her]," but that "it might have been much younger."

- The first example of sexual abuse Niece described at trial involved the touching of her breasts and buttocks. At the preliminary hearing, she testified that Castillo "touched her breasts and legs," but said nothing about her buttocks.

- Niece testified at trial that Castillo put his fingers in her vagina. At the preliminary hearing, she had testified only that he "probably" did that because she later heard that men do that "when they're being intimate." When asked at trial about the difference, she said that she didn't remember at the time, and that "with time everything's coming more back."

- Niece testified at trial that Castillo raped her "two or three times." She initially reported to law enforcement that Castillo raped her once. When asked to explain the inconsistency, she testified that she initially underreported the instances "[b]ecause it's embarrassing to tell people how many times it did happen."

- Niece testified at trial that she and her brother were often home alone in the mornings before school, and that her grandma would watch him "sometimes." Castillo's counsel asked Niece if she remembered testifying at the preliminary hearing that her brother was at her grandma's "during the time period" of the rape. She said, "Yes, there would be times they would take him over there." Niece's father also testified at trial that he or his wife would take Niece's little brother to their grandma's house before work in the morning.

- Niece testified that Castillo raped her at her family's West Jordan apartment, and that the sexual abuse stopped after her parents discovered Castillo's text messages on her phone. Niece's father testified that his wife discovered Castillo's text messages to Niece before the family moved to the West Jordan apartment.

- Niece and her parents testified at trial that when the parents confronted Castillo about the text messages, Castillo's wife and Niece's grandpa were present. Niece's grandpa and Castillo's wife testified that there was no confrontation.

- At trial, Niece testified that Castillo only denied sending the text messages when her parents confronted him. She also agreed that she previously "claim[ed] that [Castillo] apologized at that meeting."

- Niece originally testified that she "would want to cut [her]self," and "would have thoughts about killing [her]self with pills or cutting [her] veins." When Castillo's counsel asked whether she had actually cut herself, she stated that it was "mostly thoughts." But when counsel noted that she had testified during the preliminary hearing that she did, in fact, cut herself, she explained that when she was responding to counsel's questions, she was referring to suicide, not the cutting.

- Niece testified that the day she disclosed Castillo's abuse to her mother at Sam's Club, a family friend saw her crying. Castillo called the friend to testify at trial. While wearing a shirt with Castillo's name on it, the friend stated that she never saw Niece crying at Sam's Club.

*Niece's DACA Status*

¶31 In his opening statement at trial, Castillo's counsel suggested that Niece accused Castillo of sexual abuse and rape "to get permanent residency" in the United States.

¶32 On direct examination, Niece addressed her immigration status. She testified that she is authorized to work through the Deferred Action for Childhood Arrivals (DACA) program. Niece also testified that she has not pursued any other immigration status other than what is provided by DACA.

¶33 Castillo's counsel cross-examined Niece about her status, but she denied that she was afraid of deportation or that she had spoken to others about the ability to get permanent legal status in the United States if she was a crime victim. Castillo also called an immigration attorney to testify about DACA and ways someone in the DACA program can obtain a path to citizenship. The expert testified that there is no pathway to citizenship through DACA, but that a person may be able to obtain a U visa if the person is the "victim of a fairly heinous crime" and they participate in a criminal prosecution.

*Use of the Word "Victim" at Trial*

¶34 During the trial, some of the State's witnesses used the word "victim."

- When explaining why a child might delay disclosing sexual abuse, Expert said it could be due to the perpetrator's "relationship with the victim."

- Expert opined that "if the perpetrator relationship to the victim or to the child is . . . a familial one, they may be more reluctant [to disclose abuse]."

- A detective called by the State identified himself as a "detective for the special victims unit."

- Castillo's trial counsel asked Expert on cross-examination: "And your testimony today is just talking about your own personal experiences and what you've seen and what some studies have said, various different reasons why child victims may or may not make statements timely and piecemeal, all that; correct?"

- Referring to Expert, the prosecutor argued in closing, "He gave you a lot of reasons why in his experience interviewing children they don't want to talk about abuse right away. A lot of those were present here—familial relationship, pressure put on the victim."

*End of Trial*

¶35 At the close of evidence, Castillo moved for a directed verdict, seeking the dismissal of all counts. Castillo's argument, in its entirety, was that there was "not credible sufficient evidence that a jury could find proof beyond a reasonable doubt that these cases were committed." The trial court denied the motion, concluding that the State had presented sufficient evidence from which a reasonable jury could convict Castillo of the charged crimes.

¶36 During closing argument, Castillo's counsel focused on the inconsistencies in and contradictions between the witnesses' testimonies. He also addressed Expert's testimony, telling the jury that "what we heard from [Expert] when he talked about children statements, he said something very crucial. . . . False allegations occur; and they occur for a host of unknown reasons."

¶37 After deliberating, the jury found Castillo guilty on all four counts of aggravated sexual abuse of a child and guilty on the count of rape of a child. Castillo appeals.

## ISSUES AND STANDARDS OF REVIEW

¶38 Castillo first contends that the trial court erred in admitting Expert's testimony under rule 702 of the Utah Rules of Evidence. We review preserved challenges to the admission of expert testimony for an abuse of discretion. *See State v. Lopez*, 2018 UT 5, ¶ 18, 417 P.3d 116. Castillo contends that, to the extent we conclude his rule 702 evidentiary challenge to be unpreserved, his trial counsel was constitutionally ineffective. Because that issue is raised for the first time on appeal, there is no standard of review. *See State v. Hunt*, 2025 UT 54, ¶ 35, 582 P.3d 772.

¶39 Castillo next contends that his trial counsel was constitutionally ineffective for not objecting to or seeking a mistrial when Expert testified that false allegations of child sexual abuse are rare; for not objecting to use of the word "victim" at trial and for using the word himself; for not objecting to Niece's testimony about the emotional and psychological impact of the sexual abuse; and for not preserving an inherent improbability argument. Castillo also contends that the trial court committed plain error in "allowing" the use of the word "victim" by witnesses and counsel. There is no standard of review because Castillo raises these claims for the first time on appeal. *See id.*

¶40 Lastly, Castillo contends that because Niece's testimony was inherently improbable, the trial court erred in denying his motion for a directed verdict. We review a trial court's denial of a directed verdict for correctness. *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251.

## ANALYSIS

¶41 Castillo argues that his convictions cannot stand for several reasons. He first claims errors in the trial court's admittance of Expert's testimony and constitutionally deficient assistance in his trial counsel's response to that testimony. Castillo then claims errors by the trial court and ineffective assistance by his trial counsel for their handling of statements at trial using the word "victim." Next, he claims that his trial counsel provided ineffective assistance by not objecting to Niece's testimony about self-harm. He then claims that we should disregard Niece's testimony as inherently improbable and determine there isn't sufficient evidence

to support Castillo's convictions. Finally, Castillo asks us to cumulate his asserted errors if any alone doesn't warrant reversal. We address each contention in turn and ultimately deny them all.

## I. EXPERT TESTIMONY AND RULE 702

¶42 Rule 702 of the Utah Rules of Evidence permits opinion testimony from "a witness who is qualified as an expert by knowledge, skill, experience, training, or education." But that expert's scientific, technical, or other specialized knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." UTAH R. EVID. 702(a). And before that knowledge serves as a basis for that testimony, the rule requires that there be a "showing that the principles or methods" underlying that testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts. *Id.* R. 702(b). This "threshold showing . . . is satisfied if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community." *Id.* R. 702(c).

¶43 Castillo contends that the trial court erred in admitting Expert's testimony because, according to Castillo, Expert's testimony about the behaviors and disclosures of sexually abused children did not meet the threshold admissibility requirements of rule 702(b). Specifically, Castillo argues that Expert's methods were unreliable, his testimony was based on insufficient facts or data, and Expert's methods were neither reliably applied to the facts of this case nor generally accepted. Castillo insists that his trial counsel preserved this issue in the trial court. But, if we disagree, he also argues that counsel provided ineffective assistance in failing to preserve it. He also argues that his trial counsel was ineffective for not objecting to or requesting a mistrial or curative instruction for Expert's testimony "that false allegations are rare."

¶44 As we explain below, we conclude that Castillo's arguments under rule 702(b) are not preserved for our review because they were abandoned in the trial court and are therefore waived. We also conclude that Castillo has not overcome the strong presumption that his counsel's decisions relative to Expert's testimony fell within the range of reasonable professional assistance.

A. *Castillo Waived Many of His Reliability and Sufficiency Arguments Under Rule 702*

¶45 Castillo contends that he preserved his rule 702(b) objections in his pretrial motion and the ensuing arguments related to Expert's testimony. The State argues that Castillo intentionally abandoned many of his reliability and sufficiency arguments below. We agree with the State.

¶46 We have said that "[w]aiver, in the context of raising an issue before a court, is generally the relinquishment or abandonment of an issue before a trial *or* appellate court." *State v. Johnson*, 2017 UT 76, ¶ 16 n.4, 416 P.3d 443. "Waiver may be express, such as through a stipulation of the parties," or it may be "implied, such as by failing to raise an issue or argument at the required time." *Id.* And we agree with other courts that have "held that an abandoned objection is waived." *United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272–73 (10th Cir. 2007) (citing United States Supreme Court and circuit authority for the proposition that a party waives its objection when it abandons it). Also, Utah's appellate courts have "decline[d] to review an alleged error . . . when 'counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings.'" *Butterfield v. Sevier Valley Hosp.*, 2010 UT App 357, ¶ 23, 246 P.3d 120 (cleaned up) (quoting *State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111).

¶47 For example, in *State v. Gilling*, 2025 UT App 125, 576 P.3d 1170, our court of appeals concluded that counsel's initial evidentiary objection was waived when counsel later represented that counsel was "okay with" a question that arguably violated the court's earlier evidentiary ruling. *Id.* ¶ 31. Similarly, in *State v. Tafuna*, 2012 UT App 243, 286 P.3d 340, the court concluded that counsel waived any objection to a juror's partiality or ability to serve when counsel had an opportunity to object but stated that he thought the juror would be a "conscious and a good juror."[3] *Id.* ¶ 15.

---

[3] Utah courts, at times, have referred to such waivers as "invited error," which precludes the ability of a party to seek plain error review on appeal. *See, e.g., Butterfield*, 2010 UT App 357, ¶¶ 23–24; *State v. Williams*, 2020 UT App 67, ¶ 33, 462 P.3d 832. That overlap is perhaps understandable given that "invited error is a species of

(continued . . .)

¶48 Here, Castillo waived many of his arguments about reliability and the sufficiency of facts and data during oral argument on his motion to exclude Expert's testimony. Although he had argued in his written motion that Expert's anticipated testimony did not meet any of the three threshold admissibility requirements of rule 702(b), during the argument he conceded that certain topics were "proper and okay." For example, Castillo argued that he thought it was appropriate for Expert to say that he has seen delayed reports of child sexual abuse and to explain that there are "lots of reasons" for someone to delay reporting and to identify what those are. He even anticipated that Expert would testify that a child might delay reporting due to "fear, retaliation, [or] uncertainty," and that he was "okay with that kind of stuff." What concerned him instead was the possibility that Expert would quantify those reporting behaviors and testify that certain behaviors are "common" or "rare." *See supra* ¶ 22.

¶49 These assertions by Castillo's counsel to the trial court waived his objection to the reliability and sufficiency of Expert's testimony insofar as it related to the reasons a child might delay reporting sexual abuse. Castillo repeatedly assured the trial court that he did not object to Expert testifying about the behaviors of children reporting child abuse, including that they sometimes delay reporting for a variety of reasons. Thus, we will not consider his challenge to this testimony on appeal. *See Johnson*, 2017 UT 76, ¶ 16 (noting that when an "issue is waived" it "will typically not be addressed" on appeal).[4]

---

waiver." *Williams*, 2020 UT App 67, ¶ 33 (cleaned up). For purposes of this case, we need not decide whether Castillo's counsel's statements rose to the level of invited error because Castillo doesn't seek plain error review of this issue. It is enough that the relevant objections were waived.

[4] Castillo asks, in the alternative, that we review the waived portions of his rule 702 argument through the lens of ineffective assistance of counsel. This argument is inadequately briefed. Castillo contends that counsel performed deficiently in not preserving the argument, but he does not attempt to demonstrate that it was unreasonable for counsel to make the choices he did in challenging Expert's testimony. Castillo must show not only that the testimony about reporting was inadmissible under rule 702, but

(continued . . .)

¶50 Before leaving this topic, we note that Castillo did not abandon his argument that it would be improper for Expert to quantify reporting behaviors. The trial court agreed with Castillo on this part of his argument and ruled that it would not allow Expert to opine "on the frequency of false accusations, either in the form of numerical probability or by using terms like 'common' or 'rare.'" Still, despite the court's order, Expert's testimony strayed into this area at trial, and Castillo has argued that his counsel performed deficiently by not objecting to that testimony or seeking other relief. Thus, we address that argument below.

### B. Castillo Has Not Shown that His Trial Counsel Rendered Ineffective Assistance in Addressing Expert's Testimony

¶51 Castillo contends that his trial counsel rendered ineffective assistance by not objecting to Expert's testimony that false reports of child sexual abuse are "rare" or, alternatively, not moving for a mistrial or requesting a curative instruction to address it. Castillo has not shown that his counsel's performance was deficient.

¶52 Pretrial, the trial court ruled that "it would be improper" for Expert to opine on the frequency of false accusations, including by labeling them "rare." Still, when the State asked Expert to explain why a child might retract claims of sexual abuse, Expert said it could be that the allegation was false and then remarked that false allegations are "rare."

¶53 Rather than object to the testimony as outside the bounds of the court's pretrial order, Castillo's counsel requested a "short break" so that Expert could be reminded not to quantify reporting behaviors and use terms like "rare." Castillo also points to Expert's use of the words "typically," "often," or "a lot of times," when testifying about the effect of a familial relationship on a child's disclosure of sexual abuse. This testimony came in without objection.

---

that it was unreasonable for counsel not to make concessions under the circumstances. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (stating that courts "indulge a strong presumption" of reasonable assistance, so a "defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (cleaned up)). Having not engaged in that analysis, Castillo's claim fails.

¶54 We evaluate claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a defendant "must demonstrate that (1) his counsel's performance was deficient in that it 'fell below an objective standard of reasonableness' and (2) 'the deficient performance prejudiced the defense.'" *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871 (quoting *Strickland*, 466 U.S. at 687–88). A defendant's failure to "establish either element defeats a claim of ineffective assistance of counsel." *State v. Hunt*, 2025 UT 54, ¶ 65, 582 P.3d 772. Because Castillo has not established that his trial counsel performed deficiently, we only discuss deficient performance and do not reach the question of prejudice.

¶55 In assessing deficient performance, we measure the "reasonableness of counsel's challenged conduct . . . on the facts of the particular case, viewed as of the time of counsel's conduct." *Ray*, 2020 UT 12, ¶ 31 (quoting *Strickland*, 466 U.S. at 690). And we are mindful that *Strickland* requires us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and requires a defendant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689 (cleaned up). This is a heavy burden. *See State v. Larrabee*, 2013 UT 70, ¶ 18, 321 P.3d 1136.

¶56 Castillo has not carried this burden. Specifically, he has not shown that his trial counsel was objectively unreasonable by addressing Expert's problematic testimony through requesting a sidebar to assure that Expert didn't stray into impermissible testimony, through cross-examination, and through closing argument. To be sure, Expert's statement about the rarity of false allegations exceeded the trial court's restriction on his testimony and was therefore problematic. And Expert's other, expounding statements may have been close to the line. But we "must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable." *Ray*, 2020 UT 12, ¶ 32. We allow trial counsel leeway to "pick his battles." *Id.* And even if counsel's approach was not the "superior" strategy, it survives challenge if "a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Hunter*, 2021 UT 44, ¶ 68, 496 P.3d 119 (cleaned up). We cannot say that trial counsel's approach here was objectively unreasonable.

¶57  First, Castillo's trial counsel could have reasonably desired to avoid highlighting Expert's one rarity comment by addressing it in a sidebar with the prosecutor and the court. We have said that "avoidance of drawing the jury's attention to certain facts . . . is a well recognized trial strategy." *State v. Ott*, 2010 UT 1, ¶ 39, 247 P.3d 344. Counsel can make a reasonable strategic decision to "avoid further highlighting" and "calling attention" to unfavorable testimony. *State v. Haynes*, 2025 UT App 75, ¶ 67, 571 P.3d 1197. Castillo has shown that the testimony was inadmissible, but he has not shown that his trial counsel's approach was objectively unreasonable under the circumstances.

¶58  Second, trial counsel could have reasonably decided to use this opportunity to undermine Expert's credibility through cross-examination and closing argument. *See, e.g.*, *Hunter*, 2021 UT 44, ¶ 77 ("Competent counsel could have reasonably concluded that using opening and closing arguments and cross-examinations to highlight specific weaknesses in the State's case was the safer route."). On cross-examination, Castillo's counsel undermined Expert's credibility by highlighting that his testimony was based on his "own personal experiences" as a CJC interviewer, and that it was beyond the scope of Expert's role to determine the "veracity" of any given report of abuse. He also was able to get Expert to reaffirm that some allegations of child abuse are false, and that children may make false allegations "for a host of unknown reasons." Then, in his closing argument, counsel reemphasized the testimony for the jury that false allegations occur and they occur for unknown reasons. We cannot say trial counsel's strategy of cross-examination and closing argument was outside the range of legitimate decisions he could make in the context of trial. In other words, Castillo hasn't shown that his trial counsel's approach was objectively unreasonable. Thus, Castillo's claim for ineffective assistance of counsel fails.

## II.  USE OF THE WORD "VICTIM" AT TRIAL

¶59  Castillo contends that his trial counsel was constitutionally ineffective for not objecting when the word "victim" was used at trial—twice by Expert, once by the detective, and once by the prosecutor during his closing argument. He also contends that his counsel performed deficiently by using the word once himself. And finally, Castillo contends that the trial court committed plain error by "allowing" these uses of the word.

¶60 To address these contentions, we start with reviewing relevant precedent on this topic, and we apply that precedent to the challenged statements. We then apply the standards of ineffective assistance and plain error and ultimately reject his claims.

*A. We Have Expressed Concern About the Use of the Word "Victim" to Refer to Complaining Witnesses, Which Is Different from How It Was Used in this Case*

¶61 We have recognized "the gravity" of referring to a complaining witness as a victim during a trial. *See, e.g.*, *State v. Vallejo*, 2019 UT 38, ¶ 102, 449 P.3d 39. And we have said that our concern "is heightened when a defendant contends that the charged conduct did not occur at all." *State v. Hunt*, 2025 UT 54, ¶ 72, 582 P.3d 772. That's because referring to the complaining witness as a victim under such circumstances presupposes that a crime has been committed, potentially bolsters a complaining witness's credibility, and "conflicts with the presumption of innocence" to which the defendant is entitled. *Id.*; *see also Vallejo*, 2019 UT 38, ¶ 104. But we have not expressed the same level of concern when the word is not used to refer to the complaining witness.

¶62 Here, none of the five statements about which Castillo complains of referred to Niece—the complaining witness—as a victim. Detective used the word once in reference to his work with "the special victims unit." Expert used it twice when explaining possible reasons for delayed disclosure of sexual abuse. He said such a delay could be due to the perpetrator's "relationship with the victim," and that "if the perpetrator relationship to the victim . . . is a familial one, they may be more reluctant [to disclose]." Castillo's counsel used the word once when he asked Expert if his testimony about the "various different reasons why child victims may or may not make statements timely and piecemeal" was based on his personal experiences and some studies. And, in closing argument, the prosecutor reminded the jury that Expert had articulated several reasons children don't want to talk about abuse "right away," stating that "a lot of those were present here— familial relationship, pressure put on the victim."[5]

---

[5] Castillo views this reference differently, arguing that the prosecutor called Niece "the victim." But we think the prosecutor was referring to one of the reasons for delayed reporting, i.e.,

(continued . . .)

¶63 In each instance, neither the witness nor the attorney labeled Niece a victim, and thus neither the witnesses nor the attorneys bolstered Niece's testimony or undermined the presumption of innocence to which Castillo was entitled. Instead, the five references to victims in this case suggested only that there are victims of sexual abuse and that those victims may be reluctant to disclose the abuse to others.

B. *Castillo Has Not Shown Ineffective Assistance or Plain Error from the Use of the Word "Victim" at Trial*

¶64 Despite the foregoing distinction, Castillo argues that his trial counsel was constitutionally ineffective for not objecting to the several uses of the word "victim" and for using it once himself. He also argues that the trial court committed plain error by "allowing" the witnesses and counsel to use the word. We disagree.

1. Castillo Has Not Shown that His Counsel Was Deficient for Not Objecting to the Use of the Word "Victim" at Trial or for Using It Himself

¶65 To demonstrate ineffectiveness of counsel, Castillo must, as a first step, show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Castillo has not shown that his counsel's performance fell below this standard.

¶66 We start with the uses of the word "victim" by the detective, Expert, and Castillo's trial counsel. As explained above, none of these individuals used the word "victim" to refer to Niece. *See supra* ¶ 62 & n.5. Still, Castillo characterizes the use as "gravely inadmissible," arguing that referring to persons as "victims" likens them to persons who are the objects of crime and implies that the witnesses and Castillo's counsel judged their claims to be true. Castillo, however, overstates the potential impact of the word's use here.

¶67 Both *State v. Vallejo*, 2019 UT 38, 449 P.3d 39, and *State v. Devey*, 2006 UT App 219, 138 P.3d 90, on which Castillo relies, reflect a concern over the use of the word "victim" to refer to the complaining witnesses—the person who claims to have been the subject of the alleged crime. *See Vallejo*, 2019 UT 38, ¶ 103; *Devey*, 2006 UT App 219, ¶ 17. Yet those specific references are different in

---

"pressure put on the victim," and was not using "victim" in the sentence as a surrogate for Niece.

type from the generic references here. *See State v. Juarez*, 2021 UT App 53, ¶ 36, 489 P.3d 231 ("[S]tatements referring to the particular complaining witness in the case as a 'victim' often are more concerning than general statements referring to victims of crime across a particular population."). And Castillo has not shown that it was objectively unreasonable for counsel not to object to these references (or to use the word once himself) given this distinction.

¶68 Next, we address Castillo's claim that it was objectively unreasonable for trial counsel to forgo an objection to the prosecutor's use of the word "victim" in his closing argument. Castillo claims that unlike the uses of the word by detective, Expert, and his own counsel, the prosecutor used the word to refer to Niece. And he argues that in doing so, the prosecutor "improperly vouched" for Niece, and thus his trial counsel was deficient for not objecting because the "impropriety should have been obvious." We reject this claim for two reasons.

¶69 First, as we explained, we disagree with Castillo's reading of the prosecutor's statement. We read his statement as referring to victims generally, not as a surrogate for Niece. *See supra* ¶ 62 & n.5. But even if the statement could be understood as a reference to Niece, Castillo's trial counsel reasonably could have interpreted it as a more generic reference to victims that did not warrant an objection.

¶70 Second, reasonable counsel could have concluded that, in closing argument, a reference to the complaining witness as a victim was not objectionable. In a closing argument, the prosecutor argues the State has proved guilt beyond a reasonable doubt. *See* UTAH CODE § 76-1-501(1). That naturally implies the defendant committed a crime and the complainant is a crime victim. It therefore comes as no surprise that a prosecutor would refer to a complainant as a "victim" during closing argument. *See, e.g.*, *State v. Rodriguez*, 946 A.2d 294, 307 (Conn. App. Ct. 2008) ("Jurors understand the respective roles of the prosecutor and defense counsel. It should not be assumed that jurors will be unduly influenced by the prosecutor's use of the word victim.").

¶71 To be sure, a prosecutor must take due care to avoid eliciting an emotional or improper response from the jury. And it's possible that overuse of the term "victim" could cross the line and constitute impermissible vouching. But "we have repeatedly observed that counsel for each side has considerable latitude in closing arguments and may discuss fully his or her viewpoint of

the evidence and the deductions arising therefrom." *State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799 (cleaned up). This includes a prosecutor "draw[ing] permissible deductions from the evidence and mak[ing] assertions about what the jury may reasonably conclude from those deductions." *Id.* ¶ 57; *see also id.* (explaining that jurors would likely interpret a prosecutor's statement during closing argument that the complaining witness "told the truth" as a permissible assertion about what the jurors should infer from the evidence).

¶72 Here, even if the prosecutor's single use of "victim" referred to Niece, the comment would have been a permissible deduction based on the evidence. So, the comment would not have been improper, let alone "so improper that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up). Thus, we do not view counsel's choice as objectively unreasonable and accordingly reject Castillo's ineffective assistance claim.

### 2. The Trial Court Did Not Commit Plain Error by Allowing the Use of the Word "Victim" at Trial

¶73 Castillo argues that the trial court committed plain error when it did "not respond[]" to or "allow[ed]" the State's witnesses, Castillo's trial counsel, and the prosecutor to use the word "victim" at trial. Specifically, Castillo argues that it was "obviously erroneous to allow" them to use the word "victim" when Castillo denied that any crime had been committed.

¶74 To establish plain error, Castillo must show, among other things, that "an error exists" that "should have been obvious to the trial court." *State v. Marquina*, 2020 UT 66, ¶ 30, 478 P.3d 37 (cleaned up). To show an error was obvious, an appellant "must show that the law governing the error was clear, or plainly settled, at the time the alleged error was made." *State v. Johnson*, 2017 UT 76, ¶ 21, 416 P.3d 443 (cleaned up). Further, we are mindful that a trial court "is not required to constantly survey or second-guess a nonobjecting party's best interests" and "should take measures to avoid interfering with potential legal strategy or creating an impression of a lack of neutrality." *State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 (cleaned up). Applying these principles, we conclude that Castillo has not shown an obvious error that required the trial court's intervention.

¶75   To begin, it is unclear what Castillo expected the trial court to do. He refers to the trial court as having improperly "allowed" the use of the word "victim" at trial, and he even suggests that the court should have "*sua sponte* dismiss[ed] the case or . . . even give[n] an effectively timed instruction." But Castillo does not explain how the court is to blame for what appears to be unexpected and relatively isolated uses of the word "victim." Nor does he explain why dismissal of the case would have been an appropriate remedy under the circumstances or what a jury instruction would have said and when it should have been given. Further, as explained above, the several uses of the word "victim" in this case were distinguishable from the uses that this court has deemed particularly concerning. *See supra* ¶¶ 61–63 & n.5. Thus, for these reasons, Castillo has not shown that the court plainly erred.

## III. NIECE'S TESTIMONY ABOUT SELF-HARM

¶76 Castillo contends his trial counsel was constitutionally ineffective for not objecting to or seeking to exclude Niece's testimony that "Castillo's alleged crimes caused her emotional issues," including self-harm and suicidal thoughts. He argues that his counsel performed deficiently because he could have objected under rule 104 of the Utah Rules of Evidence and "require[d] the State to prove causation." He also argues that Niece's testimony about "suicidal ideation and cutting inadmissibly appealed to juror bias and emotions" in violation of rule 403. And he argues that because other witnesses did not testify that her behavior had changed from before the sexual abuse, the evidence was "significantly less probative than confusing, misleading, and [unfairly prejudicial]." Finally, Castillo asserts that choosing to address the evidence on cross-examination instead of by exclusion was unreasonable because it amplified it. We conclude that Castillo hasn't established that his trial counsel performed deficiently by forgoing an objection.

¶77  At trial, when asked if she had "any emotional problems because of what had happened," Niece testified that she "would want to cut [her]self" and "would have thoughts about killing [her]self with pills or cutting [her] veins." That was the extent of her direct testimony on the topic.

¶78  On cross-examination, Castillo's counsel asked Niece a series of questions that elicited her confirmation that she only *thought* of cutting and suicide and did not act on those thoughts. After obtaining that confirmation, he then reminded Niece that she

testified differently at the preliminary hearing. He reminded her that she had previously testified that she started cutting at age thirteen or fourteen and was still cutting herself years later. When he asked about the discrepancy, Niece testified that she *did* cut herself and that her testimony on direct examination about her "thoughts" was referring to suicide—not cutting. Counsel then asked if her parents or anyone else had ever said anything about noticing cuts on her arms, and she said, "No."

¶79 Castillo's counsel was not objectively unreasonable to forgo an objection to the admission of Niece's emotional and psychological injury testimony where he used it to undermine her credibility, consistent with his overall trial strategy. In assessing whether counsel's performance was deficient under the first prong of *Strickland v. Washington*, 466 U.S. 668 (1984), our inquiry must focus on "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. "We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "we give wide latitude to trial counsel to make tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Gallegos*, 2020 UT 19, ¶ 34, 463 P.3d 641 (cleaned up). Said differently, we don't second-guess trial counsel to determine whether a "superior" strategy existed, but instead ask "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Lovell*, 2024 UT 25, ¶ 61, 565 P.3d 497 (cleaned up).

¶80 Here, Castillo's counsel used Niece's testimony about self-harm to undermine her overall credibility by pointing out an inconsistency with her preliminary hearing testimony. Counsel could have tried to exclude the testimony, but he would have lost the opportunity to challenge her credibility based on the inconsistency. Further, because no one (including Niece's parents) corroborated her claim that she engaged in self-harm for years, counsel could have reasonably concluded that the jury might doubt the claim and therefore doubt Niece's overall veracity. Where counsel's overall trial strategy was to sow doubt about Niece and her claims, we cannot conclude that counsel's choice was unreasonable.

¶81 Additionally, Castillo has not demonstrated that counsel performed deficiently because he has not persuasively shown that the challenge he now claims his counsel should have waged was

likely to be successful. The court of appeals, in *State v. Anderson*, 2020 UT App 135, 475 P.3d 967, held that when the issue at trial is whether alleged abuse ever happened, "[c]hanges in a victim's behavior, emotional health, and lifestyle can be circumstantial evidence that the alleged act occurred." *Id.* ¶ 26; *see also State v. Dever*, 2022 UT App 35, ¶ 44, 508 P.3d 158 (same). Given this authority, reasonable counsel could have concluded that an objection to Niece's testimony would have failed. At the very least, counsel would have had doubts. Thus, it was reasonable for counsel to make the strategic choice he did.

¶82   For both reasons, we reject this ineffective assistance claim.

## IV. DIRECTED VERDICT AND INHERENT IMPROBABILITY

¶83   Castillo contends that the trial court erred in denying his motion for a directed verdict for insufficient evidence because, according to Castillo, Niece's testimony was inherently improbable under *State v. Robbins*, 2009 UT 23, 210 P.3d 288. He argues that his trial counsel preserved this issue but that, if we disagree, we should review it for ineffective assistance of counsel. Because we conclude that Castillo did not preserve this inherent improbability issue, we address it through the ineffective assistance lens and ultimately reject it.

### A. *Castillo Did Not Preserve His* Robbins *Inherent Improbability Issue*

¶84 Castillo argues that Niece's testimony was inherently improbable, and that he preserved the issue when he moved for a directed verdict on the basis that the "State's case lacked 'credible sufficient evidence' to support its charges." The State counters that this generic challenge was not enough. We agree with the State.

¶85 To preserve an issue for appeal, the issue must be presented to the trial court "in such a way that the court has an opportunity to rule on it." *State v. Stricklan*, 2020 UT 65, ¶ 127, 477 P.3d 1251 (cleaned up). For a court to have that opportunity, the "issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (cleaned up).

¶86   As we stated in *Stricklan*, a *Robbins* inherent improbability challenge is a "distinct legal theory" separate and apart from a general sufficiency challenge, so it must be specifically preserved. *Stricklan*, 2020 UT 65, ¶ 125; *see also State v. Doyle*, 2018 UT App 239, ¶ 19, 437 P.3d 1266 ("*Robbins* may be a component of an

insufficiency challenge, but not every insufficiency challenge raises a *Robbins* issue."). And although we didn't make this express in *Stricklan*, we require this specificity so that a trial court is aware that it must first decide whether the challenged testimony should be disregarded before the court engages in its sufficiency review. *Stricklan*, 2020 UT 65, ¶¶ 128–31; *cf. State v. Jok*, 2021 UT 35, ¶ 37, 493 P.3d 665 (explaining that where defendant challenges the sufficiency of the evidence based on a claim that certain testimony "was too inherently improbable" to support his conviction, the court had to first examine whether that testimony should be disregarded (cleaned up)).

¶87 So, for a defendant to preserve a *Robbins* inherent improbability issue for appeal, the defendant must provide the trial court "an opportunity to rule on the *Robbins* issue" by making a specific argument about the inherent improbability of the evidence the party contends the court should disregard. *Stricklan*, 2020 UT 65, ¶ 128. That means that a defendant generally must reference *Robbins* or the *Robbins* standard, argue that the challenged testimony meets this standard, and ask that the testimony be disregarded as inherently improbable. *Id.* ¶ 129.

¶88 When we say that a defendant "generally" must make its argument in this way, we intend that a party need not make its objection in this exact way, using these exact words. *See In re Baby Girl T.*, 2012 UT 78, ¶¶ 33, 38, 298 P.3d 1251 (declining to require "magic words" to preserve a claim). But we reiterate that to preserve a *Robbins* issue for appeal, the issue must be *specifically* raised *and* supported by evidence and relevant legal authority. *Stricklan*, 2020 UT 65, ¶ 127. In other words, a defendant must do more than simply cite the "general standard" that the evidence is insufficient. *See id.* ¶ 131.

¶89 Too often, defendants make an unspecific and unsupported sufficiency argument in the trial court and then, on appeal, argue that the trial court erred in not sussing out the defendant's unspoken intent that it should disregard a witness's testimony as inherently improbable under *Robbins*. If a defendant believes that a witness's testimony is so inherently improbable that the *Robbins* standard has been met, it should make that specific argument to the trial court, with evidentiary examples and analysis to prove its claim. Raising the issue in this way will afford a trial court the opportunity to consider first whether it's appropriate to disregard the testimony before conducting its sufficiency review.

¶90 Here, Castillo did not preserve his *Robbins* challenge because he didn't argue that Niece's testimony should be disregarded as inherently improbable. Castillo moved for a directed verdict and argued only that there was "not credible sufficient evidence that a jury could find proof beyond a reasonable doubt that these cases were committed." He didn't mention *Robbins* or its standard, nor did he argue that Niece's testimony should be disregarded because it was inherently improbable. Thus, Castillo's claim that Niece's testimony was inherently improbable is unpreserved.

### B. Castillo Has Not Established that His Trial Counsel Provided Ineffective Assistance by Not Challenging Niece's Testimony as Inherently Improbable Under Robbins

¶91 Castillo invites us to alternatively consider whether his trial counsel provided constitutionally ineffective assistance when he didn't challenge Niece's testimony as inherently improbable under *Robbins*. As explained, to meet his burden, Castillo must, in addition to proving prejudice, show that his counsel's performance "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

¶92 As our court of appeals has recognized, deficient performance is always a difficult standard to meet, but particularly in the *Robbins* context. *State v. Corona*, 2025 UT App 93, ¶ 15, 574 P.3d 988. Given that *Robbins* is the only Utah decision that has reversed a verdict under its rubric since it was issued in 2009, the court of appeals reasoned that a "reasonable attorney would be wary of making a motion based on inherent improbability in all but the most extreme case." *Id.* ¶ 18.

¶93 Here, Castillo argues that his counsel's decision not to make a *Robbins* challenge fell below an objective standard of reasonableness because Niece's testimony was inherently improbable. Specifically, he argues that because there were "material inconsistencies" in her "accounts of sexual abuse, rape, and concerning her disclosures" and her testimony was uncorroborated, it was unreasonable for counsel not to make a *Robbins* challenge. But because we conclude that Castillo hasn't shown that his counsel was objectively unreasonable in not making what was sure to be a futile motion, we reject his ineffective assistance claim. *See State v. Ring*, 2018 UT 19, ¶ 43, 424 P.3d 845 (concluding that trial counsel didn't perform deficiently in not objecting to the admission of evidence because "counsel could have

reasonably believed an objection was futile"); *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶94   Under *Robbins*, a court may disregard a challenged piece of evidence if it is "of such a poor quality that it should be disregarded." *Jok*, 2021 UT 35, ¶ 30. Said differently, when considering a sufficiency challenge, a court may disregard testimony when it "is so incredible that it could not have supported an essential element of the charge." *Robbins*, 2009 UT 23, ¶ 21. But it is only in "rare cases" where a court may disregard "testimony because it is so incredibly dubious or inherently improbable that it could not support a conviction." *Jok*, 2021 UT 35, ¶ 31. This is not one of those cases.

¶95 Castillo primarily points us to purported material inconsistencies in Niece's account of the sexual abuse and rape and her disclosures.[6] *See supra* ¶ 30. But even where there are inconsistencies, they do not "run so counter to human experience that it renders [her] testimony inherently improbable." *State v. Prater*, 2017 UT 13, ¶ 39, 392 P.3d 398; *see also Jok*, 2021 UT 35, ¶ 36 (same).

¶96 For example, Castillo complains that Niece's testimony changed over time about her age at the time of the sexual abuse or how many times she was abused or raped. He also criticizes Niece for becoming more certain of some elements of the abuse as time went on; for recalling additional details about Castillo's text messages over time; and for describing details surrounding the confrontation with Castillo differently at different times. *See supra* ¶ 30.

¶97 But reasonable trial counsel could have viewed these discrepancies as common to human experience and not the type imagined by *Robbins*. After all, Niece was recalling events from years prior and explained that some of the discrepancies were attributable to her not wanting to admit the extent of the abuse. Further, Niece was "consistent in describing the nature of the attacks and the identity of her attacker[]." *See Jok*, 2021 UT 35, ¶ 40. Thus, reasonable counsel could view these inconsistencies as

---

[6] Material inconsistencies are one of the non-exclusive factors we have identified as part of an inherent improbability inquiry. *Jok*, 2021 UT 35, ¶ 32.

undermining Niece's credibility, "good fodder for cross-examination," *State v. Barnes*, 2023 UT App 148, ¶ 22, 542 P.3d 108, and unworthy of a *Robbins* challenge.[7] Accordingly, Castillo's ineffective assistance claim fails.

V. CUMULATIVE ERROR

¶98 Castillo argues that the purported errors by the trial court and his trial counsel had a cumulative effect that establishes prejudice and warrants reversal. But because there are no errors to accumulate, the cumulative error doctrine does not apply. *State v. Hunt*, 2025 UT 54, ¶ 83, 582 P.3d 772.

**CONCLUSION**

¶99 We do not reach whether the trial court erred in admitting Expert's testimony under rule 702 because Castillo waived that argument below. We reject Castillo's claims for ineffective assistance because he failed to establish deficient performance for his trial counsel's waiver of objection under rule 702(b), approach to Expert's trial testimony, response to uses of the word "victim," and approach to Niece's testimony about self-harm. We also reject his claim of plain error because Castillo has not shown why the trial court erred in allowing the uses of "victim." Finally, we conclude that Castillo didn't preserve his *Robbins* challenge and that he hasn't established why failure to do so constituted constitutionally ineffective assistance. Accordingly, we affirm Castillo's convictions.

---

[7] Additionally, none of the other considerations relied on in *Robbins* would change a reasonable counsel's view of these inconsistencies. Castillo doesn't assert any patent falsities in Niece's testimony, *see Robbins*, 2009 UT 23, ¶ 22, and despite Castillo's argument otherwise, there was corroboration for Niece's testimony. Mother and Father testified about finding the texts from Castillo to Niece, the confrontation with Castillo about the text messages, and Castillo's later emotional apology. Finally, Castillo's claim that Niece was motivated to fabricate the allegations does not move the needle. *See supra* ¶ 31. Reasonable counsel could determine that any perceived incentive to fabricate testimony just "goes to the weight and credibility of the testimony," *Prater*, 2017 UT 13, ¶ 41, and any objection would not lead the trial court to conclude that Niece's testimony should be excluded under *Robbins*.